# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**TATIANA MARIE VELAZQUEZ**                    CIVIL ACTION

**VERSUS**                                                    No. 20-2332

**CITY OF WESTWEGO, ET AL.**                    SECTION I

## <u>ORDER & REASONS</u>

Plaintiff Tatiana Marie Velazquez ("Velazquez") was arrested at the Office of Motor Vehicles in Westwego, Louisiana for possessing a fraudulent passport, after the U.S. Passport Verification System ("USPVS") returned a "No Match" result on her valid U.S. passport. On August 21, 2020, Velazquez sued the following defendants: the City of Westwego (the "City"), Dwayne J. Munch, Sr. in his official capacity ("Chief Munch"), and Kyle Flettrich in his individual and official capacities ("Flettrich" and, together with Chief Munch and the City, the "City Defendants"), as well as the State of Louisiana via the Department of Public Safety and Corrections, Public Safety Services, Office of Motor Vehicles (the "OMV"), Amanda Cailleteau in her individual and official capacities ("Cailleteau"), and Britney Young in her individual and official capacities ("Young" and, together with the OMV and Cailleteau, the "State Defendants"). Velazquez asserts a number of claims pursuant to 42 U.S.C. § 1983, as well as Louisiana state law.

1

Each set of defendants has filed a motion to dismiss,[1] arguing that Velazquez's allegations are insufficient to state a claim for relief and should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).[2]   The State Defendants have also moved to dismiss Velazquez's claims pursuant to Federal Rule of Civil Procedure 12(b)(1), arguing that sovereign immunity bars Velazquez from securing a judgment against the OMV and its employees (in their official capacities).[3]   For the reasons that follow, the motions are granted.[4]

## I.

Velazquez was born and spent most of her life in Puerto Rico.[5]   On or about August 22, 2019, she visited the OMV's Westwego office to obtain a Louisiana driver's license.[6]   She presented her U.S. passport, social security card, a copy of her Puerto Rican driver's license, and other Puerto Rican identification documents to Cailleteau, an OMV employee.[7]

Cailleteau attempted to verify the authenticity of Velazquez's U.S. passport through the USPVS, an online service provided by a non-governmental third-party vendor, the American Association of Motor Vehicle Administrators ("AAMVA").[8]   But

---

[1] The earlier motions to dismiss filed by each set of defendants were dismissed without prejudice to allow Velazquez to amend her complaint.  R. Doc. No. 34; *see* R. Doc. No. 33.

[2] The individual defendants also argue that the claims against them are barred by qualified immunity.  R. Doc. No. 35, at 9–11; R. Doc. No. 39, at 10–18.

[3] R. Doc. No. 39, at 6–9.

[4] For the purposes of the instant motions, the Court accepts Velazquez's factual allegations as true.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[5] R. Doc. No. 33, at 1 ¶ 1.

[6] *Id.* at 4 ¶ 4.

[7] *Id.*

[8] *Id.* at 4 ¶ 5.

when Cailleteau entered the passport number into the system, she received a "No Match" response.[9]

Critically, while a "No Match" response means that a passport cannot be verified using the system, it does not indicate that the passport is fraudulent.[10] AAMVA policies and procedures do not provide that law enforcement should be called in response to a "No Match" result.[11]   Moreover, OMV's own policy for passport verification, Section 1, Number 6.05, provides only that when the system returns a "No Match" result, "the [proffered] passport cannot be accepted as an identification document and the customer must submit other identification documents."[12]

Cailleteau then phoned her supervisor, Young, at OMV headquarters in Baton Rouge; Young immediately attempted to verify the passport using the same system.[13] Young confirmed the "No Match" result and (incorrectly, as it turns out) advised Cailleteau that the passport was "fraudulent."[14]   Velazquez alleges that Young "chose not to instruct Cailleteau to request another form of identification . . . [and instead] chose to advise Cailleteau to call the police . . . and press charges" against her.[15]

---

[9] *Id.* at 5 ¶ 5.

[10] *Id.* at 5 ¶ 7.

[11] *Id.*

[12] *Id.*

[13] *Id.* at 5 ¶ 5.

[14] *Id.*

[15] *Id.* at 8 ¶ 17.  The Court accepts Velazquez's allegation regarding Young's advice as true.  But her allegation regarding Young's willfulness is conclusory and unsupported by any further allegations.  The Court need not credit such allegations. *See Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005).

Cailleteau then called the Westwego Police Department and reported that Velazquez had attempted to obtain a Louisiana driver's license by submitting a fraudulent passport as a means of identification.[16] The Westwego Police Department dispatched Officer Flettrich to investigate.[17] Flettrich did not conduct an independent investigation into the passport, instead relying solely on Cailleteau's report.[18] After Flettrich interviewed Cailleteau, he arrested Velazquez for violating La. Rev. Stat. § 14:70.7, "Possession of Fraudulent Documents," at which point she was transported to the Jefferson Parish Prison and charged with the crime.[19]

But the charge did not stick; the District Attorney for Jefferson Parish dismissed it in late May 2020.[20] By that time, though, the damage was done— Velazquez had already paid bail and incurred attorney's fees,[21] and allegedly suffered "mental anguish, emotional distress, damage to her reputation, and financial hardship."[22]

Velazquez brings four claims pursuant to 42 U.S.C. § 1983. First, she alleges that the defendants deprived her of her right to be free from unreasonable seizures, false arrests, and excessive force under the Fourth and Fourteenth Amendments.[23] Specifically, she alleges that Cailleteau, acting under color of state law, falsely

---

[16] R. Doc. No. 33, at 5 ¶ 8.
[17] *Id.*
[18] *Id.* at 5–6 ¶ 9. Velazquez suggests Flettrich could have independently checked the passport—or asked Velazquez to explain herself. *Id.*
[19] *Id.* at 6 ¶ 9.
[20] *Id.* at 6 ¶ 12.
[21] *Id.* at 6 ¶ 11.
[22] *Id.* at 8 ¶ 18.
[23] *Id.* at 9 ¶ 20.

4

reported the crime and that Young either directed Cailleteau to do so or, in the alternative, approved or condoned of Cailleteau's choice to falsely report the crime.[24] Furthermore, she alleges that Flettrich lacked probable cause to arrest her because he was presented with her facially valid passport.[25]

Second, Velazquez alleges that Flettrich, Cailleteau, and Young, acting in their individual capacities, deprived her of her right to due process and her right to be free from unreasonable seizures and false arrests under the Fourth, Fifth, and Fourteenth Amendments.[26]  The Court hoped that granting Velazquez leave to amend would yield a more coherent complaint.  But, unfortunately, this claim is virtually identical to Velazquez's first claim, apart from the reference to the Fifth Amendment and an added allegation that, while Cailleteau and Young did not place her under arrest, they are still liable under the Fourth Amendment because they utilized their positions under color of state law to falsely report criminal activity and press charges against her.[27]

Velazquez also brings an equal protection claim under the Fourteenth Amendment against all named defendants, alleging that she was arrested based "solely and exclusively upon [her] status and characteristics as a Puerto Rican."[28] And, finally, she claims that the City and Chief Munch (as a policymaker of the

---

[24] *Id.* at 10 ¶¶ 24–25.
[25] *Id.* at 12 ¶ 35.
[26] *Id.* at 12–13 ¶¶ 39, 41.
[27] *Id.* at 13 ¶ 42.
[28] *Id.* at 16 ¶ 56.

Westwego Police Department) are liable for Flettrich's conduct, under § 1983 and *Monell*.[29]

In addition to the constitutional claims, Velazquez brings a Louisiana state law claim for malicious prosecution against all defendants.[30]

## II.

"When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citing *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977)). "Under Rule 12(b)(1), a claim is 'properly dismissed for lack of subject-matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate' the claim." *Sureshot Golf Ventures, Inc. v. Topgolf Int'l, Inc.*, 754 F. App'x 235, 239 (5th Cir. 2018) (quoting *In re FEMA Trailer Formaldehyde Prod. Liab. Litig.*, 668 F.3d 281, 286 (5th Cir. 2012)).

When ruling on a Rule 12(b)(1) motion, a court may dismiss an action for lack of subject matter jurisdiction "on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record;

---

[29] *Id.* at 17–20 ¶¶ 64–67.

[30] *Id.* at 16 ¶ 58. The Court notes that Velazquez's amended complaint includes a "Prayer for Relief" seeking, among other things, attorney's fees, punitive damages, a declaratory judgment, and injunctive relief. *Id.* at 15 ¶ 49; *id.* at 20–21. Velazquez does not explain which claims support which relief and does not explain what such relief would look like. Nor has she offered any argument in response to the motions to dismiss that any non-monetary relief she is seeking should be construed as an independent claim. Therefore, any such claims are not properly before the Court.

or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Spotts v. United States*, 613 F.3d 559, 565–66 (5th Cir. 2010) (quoting *St. Tammany Parish, ex rel. Davis v. Fed. Emergency Mgmt. Agency*, 556 F.3d 307, 315 (5th Cir. 2009)). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Ramming*, 281 F.3d at 161.

Velazquez has sued the State of Louisiana through the OMV, a division of the Department of Public Safety and Corrections, Public Safety Services.[31]  The OMV asserts that it is entitled to sovereign immunity pursuant to the Eleventh Amendment of the United States Constitution.[32]

"The Eleventh Amendment grants a State immunity from suit in federal court by citizens of other States, and by its own citizens as well."  *Union Pac. R.R. Co. v. La. Pub. Serv. Comm'n*, 662 F.3d 336, 340 (5th Cir. 2011) (quoting *Lapides v. Bd. of Regents*, 535 U.S. 613, 616 (2002)).  Absent exceptions not relevant here, then, sovereign immunity generally bars a federal court from exercising jurisdiction over a suit against a non-consenting state.  *See id.*[33]

That sovereign immunity "extends to any state agency or entity deemed an 'alter ego' or 'arm' of the state."  *Perez v. Region 20 Educ. Serv. Ctr.*, 307 F.3d 318, 326 (5th Cir. 2002) (citing *Vogt v. Bd. of Comm'rs*, 294 F.3d 684, 688–89 (5th Cir.

---

[31] *Id.* at 3 ¶ 1(d).
[32] R. Doc. No. 39-1, at 6.
[33] Velazquez does not argue that Louisiana has consented to suit.  *See* R. Doc. No. 45, at 5–8.  Nor does she argue that she is seeking injunctive relief that might be addressed by *Ex Parte Young*, 209 U.S. 123 (1908).

2002)).  To determine whether an agency is an arm of the state, courts in the Fifth

Circuit employ a six-factor test, which examines:

> (1) whether state statutes and case law view the entity as an arm of the state; (2) the source of the entity's funding; (3) the entity's degree of local autonomy; (4) whether the entity is concerned primarily with local, as opposed to statewide, problems; (5) whether the entity has the authority to sue and be sued in its own name; and (6) whether the entity has the right to hold and use property.

*Id.* at 326–27.  "An entity need not show that all of the factors are satisfied; the factors

simply provide guidelines for courts to balance the equities and determine if the suit

is really one against the state itself."  *Id.* at 327 (citing *Hudson v. City of New Orleans*,

174 F.3d 677, 682 (5th Cir. 1999)).  Notably, the Fifth Circuit has held that "[the

Department of Public Safety and Corrections], as a Louisiana executive department,

and [the] OMV, as a division within that department, are entitled to the Eleventh

Amendment's protection."  *Hanna v. LeBlanc*, 716 F. App'x 265, 268 (5th Cir. 2017)

(applying the factors and citing Fifth Circuit precedent).

Velazquez argues that the OMV (1) can sue and be sued; (2) can hold

property;[34] and (3) has accepted federal grants to comply with the requirements of

the federal Real ID Act, rendering it, in part, funded by the federal government.[35]

She argues that these factors militate against a finding that immunity applies.[36]

While the Court is not required to accept the factual underpinnings of

Velazquez's argument,[37] it will do so *arguendo*.  The Fifth Circuit has already

---

[34] R. Doc. No. 45, at 6 (citing La. Rev. Stat. § 36.401(A)–(B)).

[35] *Id.*

[36] *Id.*

[37] Because sovereign immunity was raised in the defendants' Rule 12(b)(1) motion.

concluded that the DPSC and OMV are entitled to sovereign immunity.  And even if the acceptance of Real ID Act funds post-dates the Fifth Circuit's last expression of this conclusion (in 2017), that is not enough.  Velazquez has not offered enough evidence to convince the Court to break with precedent.  She does not argue, for example, that the federal government (rather than the State of Louisiana) would be responsible for any judgment issued in this case.  And just how much of the OMV's funding comes from the federal government?  Velazquez does not say.  The burden here is Velazquez's, *see Ramming*, 281 F.3d at 161—and she has not carried it.

The Court concludes that the OMV is still entitled to sovereign immunity.  This immunity extends to OMV personnel sued in their official capacity.  *See Hafer v. Melo*, 502 U.S. 21, 25 (1992) ("Suits against state officials in their official capacity . . . should be treated as suits against the State.").  Accordingly, the claims against the State of Louisiana via the OMV and Defendants Cailleteau and Young in their official capacities are dismissed.

### III.

#### A.      Rule 12(b)(6) Standard

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. Proc. 8(a)(2).  Under Rule 12(b)(6), a district court may dismiss a complaint, or any part of it, when the plaintiff fails to set forth well-pleaded factual allegations that would entitle him or her to relief.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Cuvillier v. Sullivan*, 503 F.3d 397, 401 (5th Cir. 2007).

To survive a Rule 12(b)(6) motion, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570)). A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Consequently, a plaintiff need not allege detailed factual allegations but must raise a right to relief beyond mere speculation. *Id.*

A court reviews the complaint in the light most favorable to the plaintiff. *Gentilello v. Rege*, 627 F.3d 540, 544 (5th Cir. 2010). However, courts "do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005) (citing *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 361 (5th Cir. 2004)). Furthermore, a court should not look beyond the pleadings to determine whether relief should be granted. *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999).

### B.   Qualified Immunity Standard

The doctrine of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

Qualified immunity shields government officials from civil liability so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S.

800, 818 (1982); *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) ("Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions."). This protection applies "regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Pearson*, 555 U.S. at 231 (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)).

Once the qualified immunity defense is raised, the plaintiff bears the burden of proving the defendants are not entitled to qualified immunity. *Shaw v. Villanueva*, 918 F.3d 414, 416-17 (5th Cir. 2019). "[A] plaintiff seeking to overcome qualified immunity must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm he has alleged and that defeat a qualified immunity defense with equal specificity." *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012).

The plaintiff "must show: '(1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct.'" *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc) (quoting *al-Kidd*, 563 U.S. at 735). A court may address these prongs in whichever order it sees fit. *Id.* (citing *Pearson*, 555 U.S. at 236). Each defendant's actions must be considered individually, *even if they act in unison. Meadours v. Ermel*, 483 F.3d 417, 421–22 (5th Cir. 2007).

At the Rule 12(b)(6) stage, then, the first prong of the qualified immunity analysis requires the Court—viewing the facts in the light most favorable to the

plaintiff—to determine whether the plaintiff has alleged a violation of her constitutional or statutory rights. *See Trevino v. Hinz*, 751 F. App'x 551, 553 (5th Cir. 2018).

"When deciding whether the right allegedly violated was 'clearly established,' [a] court asks whether the law so clearly and unambiguously prohibited the conduct that *every* reasonable official would understand that what he is doing violates the law." *Wyatt v. Fletcher*, 718 F.3d 496, 503 (5th Cir. 2013) (emphasis in original); *see also Carroll v. Ellington*, 800 F.3d 154, 169 (5th Cir. 2015) ("A government official's acts are not objectively unreasonable unless all reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated the plaintiff's rights."). In other words, precedent existing at the time of the challenged conduct "must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741.

### C.     Section 1983

"Section 1983 provides a private right of action against parties acting 'under color of any statute, ordinance, regulation, custom, or usage, of any State' to redress the deprivation of rights secured by the United States Constitution or federal law." *Bauer v. Texas*, 341 F.3d 352, 357 (5th Cir. 2003) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121 (1988)). "Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). To recover under § 1983, a plaintiff must

allege (1) the deprivation of a federally protected right, and (2) "that the deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

While municipalities can be liable under § 1983, they are not liable under a *respondeat superior* theory. *Webb v. Town of Saint Joseph*, 925 F.3d 209, 214 (5th Cir. 2019) (citing *Davidson v. City of Stafford*, 848 F.3d 384, 395 (5th Cir. 2017)). Instead, "the unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur; isolated unconstitutional actions by municipal employees will almost never trigger liability." *Id.* (quoting *Piotrowski*, 237 F.3d at 578). Therefore, "[m]unicipal liability under § 1983 requires proof of 1) a policymaker; 2) an official policy; 3) and a violation of constitutional rights whose 'moving force' is the policy or custom." *Rivera v. Houston Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003) (quoting *Piotrowski*, 237 F.3d at 578).

## IV.

As a preliminary matter, the claims against Chief Munch and Flettrich in their official capacities must be dismissed as duplicative of the same claims made against the City because "[a] claim against an officer in his official capacity is treated as a claim against the municipality."[38] *Jordan v. Brumfield*, 687 F. App'x 408, 415 (5th Cir. 2017) (citing *Brooks v. George Cnty.*, 84 F.3d 157, 165 (5th Cir. 1996)).

---

[38] Velazquez sued Chief Munch only in his official capacity, so all federal claims against him are dismissed. R. Doc. No. 33, at 2 ¶ 1. The Court notes that the City Defendants raised this argument in both their first and second motions to dismiss;

A.    Constitutional Claims

Velazquez's remaining constitutional claims are against the City of Westwego[39] and against Flettrich, Cailleteau, and Young in their individual capacities for violating: (1) her right not to suffer excessive force under the Fourth and Fourteenth Amendments; (2) her right to due process afforded by the Fifth Amendment; (3) her right to equal protection under the Fourteenth Amendment; and (4) her right to protection from unreasonable seizures and false arrest under the Fourth and Fourteenth Amendments.

_1._    *Fourth Amendment Excessive Force*

To bring a Fourth Amendment excessive force claim under § 1983, Velazquez must show that, when she was seized, "she suffered (1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and (3) that the force used was objectively unreasonable." *Flores v. City of Palacios*, 381 F.3d 391, 396 (5th Cir. 2004). While there is no requirement "that [a plaintiff's] injury be significant, serious, or more than minor," they must allege to have suffered "more than *de minimis* physical injury." *Benoit v. Bordelon*, 596 F. App'x 264, 269 (5th Cir. 2015); *see Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999) (quoting *Jackson v. R.E. Culbertson*, 984 F.2d 699, 700 (5th Cir. 1993)).

---

Velazquez did not respond.  R. Doc. No. 13, at 16–17; R. Doc. No. 35, at 17–18.  The Court warned Velazquez that such a failure might be taken as a lack of opposition. R. Doc. No. 34, at 1 n.3.  The Court therefore takes her non-response to indicate a lack of opposition.

[39] Velazquez brings claims against the City of Westwego under *Monell v. Dep't Soc. Serv.*, 436 U.S. 658 (1978); *see* R. Doc. No. 33, at 17–20 ¶¶ 63–67.

Despite amending her complaint, Velazquez has failed to allege anything from which a reasonable inference could be drawn that the defendants used excessive force.[40]  Most notably, Velazquez does not allege that, when arrested, she suffered *any* type of injury—a requirement of an excessive force claim.  *See Bramer*, 180 F.3d at 703.  Further, Velazquez does not allege that *any force* was used to arrest her.  Velazquez offers only a conclusory statement that the conduct of the defendants violated her right to be free from excessive force under the Fourth and Fourteenth Amendments.[41]  Such allegations are not enough to survive a 12(b)(6) motion to dismiss.  *See Plotkin*, 407 F.3d at 696.  Accordingly, the excessive force claim will be dismissed.

## 2. *Fifth Amendment Due Process*

Velazquez also appears to assert a Fifth Amendment due process claim against Flettrich, Cailleteau, and Young in their individual capacities.[42]  However, the due process clause of the Fifth Amendment applies only to actions of the federal government.  *See Arnold v. Williams*, 979 F.3d 262, 270 (5th Cir. 2020) (holding that the plaintiff failed to state a claim under the Fifth Amendment due process clause because the defendant "was an officer of the state of Louisiana rather than of the federal government"); *id.* at 265 n.2 ("The district court correctly observed that only

---

[40] And her opposition failed to respond to the defendants' arguments on this point.  *See* R. Doc. No. 41; R. Doc. No. 45; *see also* R. Doc. No. 34, at 1 n.3 (noting that such a failure might lead the Court to treat the defendants' motion as unopposed).
[41] *See* R. Doc. No. 33, at 9 ¶ 20.
[42] R. Doc. No. 33, at 12–13 ¶ 39.  She did not, however, attempt to defend the claim in her opposition to the instant motions.  *See* R. Doc. No. 41; R. Doc. No. 45.

the Fourteenth Amendment's Due Process Clause, and not the Fifth Amendment's, applies to state law enforcement officers[.]"); *Morin v. Caire*, 77 F.3d 116, 120 (5th Cir. 1996) (noting that the Fifth Amendment does not apply "to the actions of a municipal government").

Velazquez's Fifth Amendment claim fails because the officers and actors involved were employees of the State of Louisiana and the City.  These claims will therefore be dismissed.

### *3. Fourteenth Amendment Equal Protection*

Next, Velazquez alleges that the actions of Flettrich, Cailleteau, and Young were carried out based upon her characteristics and status as a Puerto Rican and/or because she spoke with a heavy Spanish accent, which amounts to a violation of her right to equal protection under the Fourteenth Amendment.[43]

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 212 (1982)).  "[A] violation of equal protection occurs only when the government treats someone differently than others similarly situated; if the challenged government action does not appear to classify or distinguish between two or more relevant groups, then the action—even if

---

[43] R. Doc. No. 33, at 15–16 ¶¶ 53–54, 56.  In her opposition to the City Defendants' motion to dismiss, Velazquez clarified that her position is that she "was treated differently than others because of her nationality/ethnicity."  R. Doc. No. 45, at 12.

irrational—does not deny them equal protection of the laws." *Brennan v. Stewart*, 834 F.2d 1248, 1257 (5th Cir. 1988).

To assert an equal protection claim on the basis of membership in a protected class, Velazquez must allege that "a state actor intentionally discriminated against [her] because of [her] membership in a protected class."[44] *Gibson v. Tex. Dep't of Ins.*, 700 F.3d 227, 238 (5th Cir. 2012) (quoting *Bramer*, 180 F.3d at 705). Classifications based on race or national origin "are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest." *Cleburne Living Ctr.*, 473 U.S. at 440.

According to the amended complaint, Velazquez is from Puerto Rico and speaks English with a heavy Spanish accent.[45] These characteristics, she explains, were the reason that Cailleteau and Young "instituted criminal charges" against her[46] and the sole reason that she was arrested by Flettrich[47]—though her amended complaint offers no evidence in support of the assertion. In her opposition to the State Defendants' motion, Velazquez argues that she "is aware of at least one other Puerto Rican who was also arrested, and later had the charges dismissed, after presenting a valid U.S. passport in an effort to obtain a Louisiana driver's license."[48]

---

[44] Velazquez does not appear to be pursuing a claim that she was "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment," as she offers no allegations that anyone else was treated differently. *Gibson*, 700 F.3d at 238.

[45] R. Doc. No. 33, at 15 ¶ 53.

[46] *Id.*

[47] *Id.* at 16 ¶ 56.

[48] *Id.* (citing *Rivera-Colon v. Parish of St. Bernard*, No. 20-1101, 2021 WL 354432, at *1, *3 (E.D. La. Feb. 2, 2021) (Barbier, J.)) (finding that the facts suggested there was

Both sets of defendants argue that Velazquez's allegations that their conduct was motivated by her Spanish accent and her Puerto Rican citizenship are merely conclusory and, therefore, insufficient to state a claim.[49]  And the State Defendants add that Velazquez's assertion in her opposition regarding a similar case is not properly before the Court, as it is not included in the original or amended complaint.[50]

Velazquez's claim fails because her allegations that the defendants' actions constituted intentional discrimination are entirely conclusory.[51]   *See Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 412 ("Allegations [of discriminatory intent] that are merely conclusory, without reference to specific facts, will not suffice.") (alterations in original) (quoting *Priester v. Lowndes Cty.*, 354 F.3d 414, 420 (5th Cir. 2004)); *Jabary v. City of Allen*, 547 F. App'x 600, 605 (5th Cir. 2013) (holding that the plaintiff's allegations that the defendants undertook their wrongful activities because of his membership in certain protected classes were inadequate because "he fail[ed] to elaborate on the causal connection between his alleged mistreatment and his membership in those protected classes").

Velazquez did not include her statement regarding the OMV's treatment of another Puerto Rican in her initial complaint.  The Court granted her leave to amend

---

probable cause to arrest the plaintiff after he presented a New York driver's license along with a Puerto Rican identification card to obtain a Louisiana driver's license, but the OMV employee erroneously entered the number of the identification card to verify the license instead of the license number and the verification system determined it was fraudulent).

[49] R. Doc. No. 39-1, at 16–17; R. Doc. No. 35-1, at 14–15.

[50] R. Doc. No. 54, at 1–2.

[51] *See* R. Doc. No. 33, at 15–16 ¶¶ 50–56.

the complaint, and she did, but still failed to make any such allegation.  The Court suspects the omission of the statement from the complaints was intentional, as Velazquez effectively acknowledges that her pleadings as to this claim are insufficient, arguing instead that discovery will turn up evidence to support the claim—without offering the Court any hint as to what that evidence might be.[52] Velazquez had the opportunity—twice—to make sufficient allegations to defeat a motion to dismiss and reach discovery.  She did not do so.  In these circumstances, the Court will not consider such a statement, made for the first time in opposition to a motion.[53]  *See Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019) ("In determining whether a plaintiff's claims survive a Rule 12(b)(6) motion to dismiss, the factual information to which the court addresses its inquiry is limited to the (1) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201."); *cf. Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 ("not[ing] approvingly" the practice of considering documents attached to a motion to dismiss "if they are referred to in the plaintiff's complaint and are central to her claim"

---

[52] R. Doc. No. 45, at 12 ("Based upon her experience and that of the plaintiff in the other lawsuit, Velazquez believes that the evidence will show that she was treated differently than non-Puerto Ricans who present a U.S. Passport that receives a 'No Match' response.  However, the support for this belief can only be obtained through discovery.").

[53] The Court does not intend to suggest that, were this assertion included in the amended complaint, Velazquez's claim would survive.  Indeed, the Court suspects otherwise; "[a]lthough [Velazquez's statement is] consistent with an equal protection claim, [it] fail[s] to 'nudge [her] claim of purposeful discrimination across the line from conceivable to plausible.'"  *Jabary*, 547 F. App'x at 605 (quoting *Iqbal*, 556 U.S. at 683)).

(quotation omitted)). Accordingly, Velazquez's equal protection claims will be dismissed.

### <u>4.</u> *Fourth Amendment Unreasonable Seizure and False Arrest*

Velazquez further alleges that Flettrich, Cailleteau, and Young violated her right to be free from unreasonable seizure and false arrest under the Fourth Amendment.[54]   She also argues that they are not entitled to qualified immunity because they knew or should have known that she was not in violation of the law because her passport was valid.[55]

The Fourth Amendment protects the right to be secure from unreasonable seizures.  U.S. Const. amend. IV.  To state a claim under § 1983 for unreasonable seizure, Velazquez must demonstrate that (1) she was seized within the meaning of the Fourth Amendment and (2) such seizure was unreasonable.  *See Brower v. Cnty. of Inyo*, 489 U.S. 593, 599 (1989).  It is undisputed that Velazquez, who was arrested, was seized for purposes of the Fourth Amendment.  *See, e.g.*, *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975).  With regard to the reasonableness of her arrest, "the general rule [is] that [such a] Fourth Amendment seizure[] [is] reasonable only if based on probable cause."  *Bailey v. United States*, 568 U.S. 186, 192 (2013) (internal quotations and citation omitted).  And, if probable cause exists, the claim fails.  *See Clark v. Thompson*, No. 20-10568, 2021 WL 911293, at *6 (5th Cir. Mar. 9, 2021) ("The 'constitutional torts' of false arrest, unreasonable seizure, and false

---

[54] *Id.* at 9 ¶ 20, 12 ¶ 39.
[55] *Id.* at 7–8 ¶¶ 16–17, 12 ¶ 35.

imprisonment also require a showing of *no probable cause*." (quoting *Brown v. Lyford*, 243 F.3d 185, 189 (5th Cir. 2001)) (emphasis in original)).

Similarly, to prevail on her false arrest claim, Velazquez "must sufficiently allege (1) that [she] was arrested, and (2) the arrest did not have the requisite probable cause." *Rhodes v. Prince*, 360 F. App'x 555, 558 (5th Cir. 2010) (citing *Haggerty v. Tex. S. Univ.*, 391 F.3d 653, 655–56 (5th Cir. 2004)). Accordingly, to establish a constitutional violation of her Fourth Amendment right to be free from false arrest and from unreasonable seizure, she must show that there was no probable cause to arrest her. *See Haggerty*, 391 F.3d at 655–56. If her arrest was supported by probable cause, her claims under the Fourth Amendment fail before the defendants' qualified immunity defense ever rears its head—though the existence of probable cause also entitles the defendants to qualified immunity. *See id.*; *Marks v. Hudson*, 933 F.3d 481, 483 (5th Cir. 2019).

"Probable cause exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *United States v. Levine,* 80 F.3d 129, 132 (5th Cir. 1996). The belief that an offense was committed need not "be correct or more likely true than false." *Piazza v. Mayne*, 217 F.3d 239, 246 (5th Cir. 2000). Rather, the probable cause analysis requires only that the officer believed "to a fair probability that a violation occurred." *Id.* (internal quotations omitted). In deciding whether probable cause exists, police officers are not required to be perfect, nor must they "err on the side of caution out of the fear of

being sued." *Martin v. Thomas*, 973 F.2d 449, 453 (5th Cir. 1992); *see also Nerio v. Evans*, 974 F.3d 571, 576 (5th Cir. 2020) (noting in the context of a mistaken identity case that the Supreme Court has stated "the 'Constitution does not guarantee that only the guilty will be arrested' nor does it require officials 'to perform an error-free investigation'" (quoting *Baker v. McCollan*, 443 U.S. 137, 145–46 (1979))). Furthermore, "[w]hether the crime actually occurred or whether a suspect is eventually convicted is irrelevant to the probable cause analysis." *Morris v. Dillard Dep't Stores, Inc.*, 277 F.3d 743, 754 n.10 (5th Cir. 2001); *see also Deville v. Marcantel*, 567 F.3d 156, 165 (5th Cir. 2009) ("[E]vidence that the arrestee was innocent of the crime is not necessarily dispositive of whether the officer had probable cause to conduct the arrest[.]").

The Fifth Circuit has consistently recognized that officers may have probable cause to make an arrest when they reasonably rely solely on first-hand information from third parties who have specialized knowledge regarding the alleged criminal conduct. *See United States v. Hernandez*, 825 F.2d 846, 849–50 (5th Cir. 1987);[56] *United States v. Maryland*, 479 F.2d 566, 569 (5th Cir. 1973) (finding probable cause for an arrest where a liquor store clerk conveyed to police that he had received counterfeit bills and described the individuals who he believed were responsible); *United States v. Lowery*, 436 F.2d 1171, 1173–74 (5th Cir. 1970) (finding probable

---

[56] In *Hernandez*, the Fifth Circuit found probable cause for an arrest where a carnival vendor identified individuals to the police who had attempted to pass him a counterfeit bill.  825 F.2d at 849.  The Court noted that it was known to the police that the carnival vendor "necessarily dealt with currency."  *Id.* at 850.

cause for an arrest where a hotel manager told police that an individual possessed a fraudulent credit card after the manager called the company issuing the card and was informed the card had been reported as stolen).

Velazquez was charged with violating La. Rev. Stat. § 14:70.7.  That statute makes it "unlawful for any person to knowingly or intentionally produce, manufacture, distribute, or *possess* fraudulent documents for identification purposes."  La. Rev. Stat. § 14:70.7(A) (emphasis added).  "Fraudulent documents" are defined under the statute as documents "presented as being bona fide documents which provide personal identification information[,] but which are, in fact, false, forged, altered, or counterfeit."  La. Rev. Stat. § 14:70.7(B)(2).  The provision explicitly covers passports.  La. Rev. Stat. § 14:70.7(B)(3)(m).

i.   *Velazquez has Failed to State a Claim for Relief Under the Fourth Amendment Against Flettrich.*

In alleging that Flettrich lacked probable cause to arrest her, Velazquez argues that Flettrich performed an inadequate investigation by failing to do anything beyond "simply interviewing Cailleteau."[57]  Velazquez makes no argument that probable cause was lacking to arrest her based on the language of the criminal statute she was charged with violating.  Instead, in her opposition, she suggests that Flettrich's investigation was inadequate because he did not make any inquiry into the significance of the "No Match" result nor did he contact the U.S. State Department or the local field office of the Diplomatic Security Service to determine if the passport

---

[57] R. Doc. No. 33, at 7 ¶ 15.

was legitimate.[58]  Velazquez also argues, without support, that because the District Attorney dismissed the charge against her, there is a "presumption of [a] lack of probable cause."[59]

Flettrich argues that probable cause existed to detain Velazquez for possession of fraudulent documents because he interviewed and spoke with Cailleteau, an employee of the OMV, which is "a State department that routinely verifies forms of identification when issuing driver's licenses."[60]  In response, Velazquez argues that Flettrich was not presented with an obviously fraudulent document that supported the eyewitness account; instead, he was presented with a facially, and factually, valid passport accompanied by additional documentation establishing Velazquez's identity.[61]  Still, he chose not to conduct any investigation whatsoever.[62]

Velazquez also likens her case to *Wheeler v. Cosden Oil & Chemical Co.*, 734 F.2d 254 (5th Cir. 1948).[63]  In *Wheeler*, the Fifth Circuit reversed the district court's dismissal of a false arrest claim, concluding that the plaintiffs stated a claim where they alleged that they were arrested "based on information which the state knew to be false" because a Railroad Commission agent had intentionally tampered with the monitoring equipment that produced the evidence.  *Id.* at 256, 260.[64]

---

[58] R. Doc. No. 41, at 7.

[59] R. Doc. No. 33, at 14 ¶ 44.

[60] R. Doc. No. 35-1, at 9.

[61] R. Doc. No. 41, at 7.

[62] *Id.*

[63] *Id.* at 7–8.

[64] *Id.* (citing *Wheeler*, 734 F.2d at 260–61).  Velazquez also directs the Court's attention to *Barnes v. McQueen*, No. 14-2636, 2016 WL 866710 (E.D. La. Mar. 7, 2016), a case in which a district court denied a motion to dismiss a claim for false

The Court has little difficulty concluding that probable cause existed.  Based on the facts alleged by Velazquez, Officer Flettrich reasonably relied on the OMV employees' report and the AAMVA search results to conclude that there was probable cause to suspect that the passport was illegitimate.  And—far from clearly establishing that this was unconstitutional—Fifth Circuit precedent makes clear that an officer is *generally entitled to do this*.

Flettrich—like the officers in *Hernandez*—interviewed and spoke with Cailleteau, who necessarily deals with passports by virtue of her position at the OMV. Additionally, the Court in *Hernandez* noted that the carnival vendor had "displayed confidence" in his ability to recognize the bill as counterfeit when he immediately rejected the bill and promptly notified the police.  *Id.*  Velazquez does not allege that Young or Cailleteau communicated any uncertainty to Flettrich regarding the validity of the passport.  And, distinguishing this case from *Wheeler*, Velazquez does not allege that the OMV employees tampered with the USPVS system to produce the "No Match" result—or that Flettrich was aware of any such impropriety.  At best, Velazquez conclusorily alleges that the OMV employees "knew or should have known" that a "No Match" result does not necessarily mean that a document is illegitimate, and that they are not required to report such a result to the police.

---

arrest after a police officer allegedly battered and ordered the arrest of his wife's ex-husband, claiming he was violating a protective order by attempting to pick up his children.  *McQueen* is not precedential—and even if it were, the allegations are easily distinguishable.  Velazquez offers no non-conclusory allegations that Cailleteau or Young had malicious intentions in filing their report.  There is no substantive allegation of any pre-existing relationship or racial animus.  The case is inapposite.

Similarly, Velazquez's focus on whether her passport was "obviously fraudulent" misses the mark.  It was the carnival vendor in *Hernandez* who conveyed to the officers that the bill in question was an "obviously counterfeit twenty-dollar bill."  *Hernandez*, 825 F.2d at 850.  The officers relied on this statement and the carnival vendor's relevant expertise; the police themselves did not identify the bill as "obviously fraudulent."  *Id.* Therefore, whether Flettrich was presented with a facially legitimate passport is not the focus here; the key is that he relied on Cailleteau's and Young's statements, as well as their expertise in assessing the legitimacy of passports.

Velazquez's possession of additional corroborating documents changes nothing.  First, the documents' existence does not preclude the possibility that her passport was fraudulent.  Furthermore, an officer is not required to perform a perfect investigation by eliminating all possible explanations of suspected criminal activity to support a finding of probable cause.  *See McCollan*, 443 U.S. at 145–46; *Thomas*, 973 F.2d at 453.

Velazquez's argument that the District Attorney's dismissal of her case creates a presumption of probable cause is similarly misplaced.  It is true that some Louisiana courts have concluded that, under *Louisiana law*, when charges against a *malicious prosecution* plaintiff are dropped, a presumption of no probable cause arises, shifting the summary judgment burden on that point to defendants.  *See, e.g., Smith v. City*

*Bank & Trust Co.*, 271 So. 3d 263, 270 (La. Ct. App. 3d Cir. 2019).[65]  That may matter for purposes of Velazquez's state law malicious prosecution claim.  But Velazquez offers the Court no reason to think it is at all relevant to the qualified immunity analysis—or to her federal claims generally.

Flettrich, reasonably relying on the OMV employees' report, had probable cause to "believe to a fair probability" that Velazquez possessed an illegitimate passport.  *Piazza*, 217 F.3d at 246.  That the passport ultimately proved legitimate is irrelevant to the determination.  *See id.*; *Morris*, 277 F.3d at 754 n.10; *Deville*, 567 F.3d at 165.  Although one might argue that officers presented with such a scenario should dig a little deeper, the law does not require them to do so.  *See Martin*, 973 F.2d at 453; *Nerio*, 974 F.3d at 576; *see also Barfield v. Louisiana*, 325 F. App'x 292, 296 (5th Cir. 2009) (noting that officers are not required to "perform a perfect investigation that uncovers all readily available exculpatory evidence").

Because Flettrich had probable cause, no constitutional violation occurred and Velazquez's claim against him fails.  And, even if Flettrich did not have probable cause, he would almost certainly still be entitled to qualified immunity.  The Fifth Circuit has made clear that law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity, as "[q]ualified immunity gives ample room for mistaken judgments."  *Mendenhall v. Riser*, 213 F.3d

---

[65] Though the Fifth Circuit and the Louisiana Supreme Court have observed that "malicious-prosecution actions are '[n]ever favored in [Louisiana] law.'"  *James v. Woods*, 899 F.3d 404, 408–09 (5th Cir. 2018) (quoting *Kennedy v. Sheriff of E. Baton Rouge*, 935 So. 2d 669, 690 n.20 (La. 2006)).

226, 230 (5th Cir. 2000). "[I]f a reasonable officer could have concluded that there was probable cause upon the facts then available to him, qualified immunity will apply." *McCoy v. Housing Auth. of New Orleans*, 714 F. App'x 322, 326 (5th Cir. 2017) (quoting *Lyford*, 243 F.3d at 190). The Court has already stated that it has little difficulty concluding that probable cause existed. It finds it even easier to conclude that a reasonable officer would think the same.

Because Velazquez has failed to state a claim for unreasonable seizure or false arrest under the Fourth Amendment, her claim against Flettrich fails; Flettrich is "entitled to qualified immunity." *Marks*, 933 F.3d at 483.

*ii.*   *Velazquez has Failed to State a Claim for Relief Under the Fourth Amendment Against Cailleteau and Young.*

Next, Velazquez argues that Cailleteau and Young caused her false arrest by "utiliz[ing] their positions under color of state law to falsely report criminal activity."[66] But the Fifth Circuit has held that "causing charges to be filed without probable cause will not[,] without more[,] violate the constitution." *Castellano v. Fragozo*, 352 F.3d 939, 953 (5th Cir. 2003).

Velazquez's opposition argues that a violation occurred because Cailleteau and Young failed to adhere to OMV policy.[67] She adds that her argument is not that the OMV defendants violated the Constitution by failing to "investigate further."[68]

---

[66] R. Doc. No. 33, at 13 ¶ 42.

[67] R. Doc. No. 45, at 10.

[68] *Id.* Moreover, the Fifth Circuit has repeatedly concluded that negligence cannot support a claim under § 1983. *See, e.g.*, *Brown v. Wackenhut Corp.*, 8 F.3d 23, 23 (5th Cir. 1993) (per curiam) ("Negligence does not support a claim under 42 U.S.C. § 1983.").

Rather, her argument is that Cailleteau and Young "ignored clear OMV policy as well as published information regarding the use of the USPVS."[69]  She argues that the OMV policy regarding a "No Match" response "calls for the rejection of the passport as a means of identification," but "does not call for a report of criminal activity."[70]  She adds that USPVS guidelines "do not support a conclusion that the 'No Match' response equates to a fraudulent passport."[71]  In response, the State Defendants argue that a violation of internal policies does not in and of itself establish a constitutional violation.[72]

As an initial matter, the State Defendants are correct; a failure to follow policy is not in and of itself a constitutional violation.  *See Pratt v. Harris Cnty.*, 822 F.3d 174, 183–84 (5th Cir. 2016) (noting that the constitutionality of an official's actions is "neither guided nor governed . . . by [her] adherence to the policies of the department under which [she] operates"); *see also Hernandez v. Estelle*, 788 F.2d 1154, 1158 (5th Cir. 1986) ("The claim is that the mere failure . . . to follow their [departmental] regulations was a constitutional violation.  There is no such controlling constitutional principle.").  But even if it were, Velazquez *does not actually allege that a particular policy was violated*, just that it did not *require* the defendants to do what they did.

For these reasons (and others the Court need not reach), Velazquez has failed to allege that the State Defendants violated the Fourth Amendment.  And "because

---

[69] *Id.*
[70] *Id.* at 9.
[71] *Id.*
[72] R. Doc. No. 54, at 3.

there was no constitutional violation," the State Defendants are "entitled to qualified immunity." *Marks*, 933 F.3d at 483.

### 5. *Municipal Liability*

Finally, Velazquez asserts that the City of Westwego is liable under *Monell*. To prevail on this claim, Velazquez must allege (1) a policymaker; (2) an official policy; and (3) a constitutional violation whose "moving force" is the policy or custom. *Rivera*, 349 F.3d at 247. The existence of a policy may be shown by "[a] persistent, widespread practice of City officials or employees . . . so common and well-settled as to constitute a custom that fairly represents municipal policy." *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc). However, "[a]llegations of an isolated incident are not sufficient." *Fraire v. City of Arlington*, 957 F.2d 1268, 1278 (5th Cir. 1992). Moreover, "[t]he description of a policy or custom and its relationship to the underlying constitutional violation . . . cannot be conclusory; it must contain specific facts." *Spiller v. City of Texas City*, 130 F.3d 162, 167 (5th Cir. 1997) (internal quotations and citation omitted).

Importantly, in the absence of any underlying constitutional violation, there can be no municipal liability under *Monell*. *See Albert v. City of Petal*, 819 F. App'x 200, 203 (5th Cir. 2020) (noting that because there was no constitutional violation, there can be no *Monell* claims); *Brown v. Wilkinson Cnty. Sheriff Dep't*, 742 F. App'x 883, 884 (5th Cir. 2018) (holding that because the plaintiff failed to demonstrate an underlying constitutional violation the claims against the county and the officers in their official capacities failed); *Harris v. Serpas*, 745 F.3d 767, 774 (5th Cir. 2014)

(upholding the district court's dismissal of the *Monell* claims because the plaintiffs had not shown there was a constitutional violation).

Velazquez argues that the City and Chief Munch have "policies, procedures, customs and practices which violate the constitutional rights of residents."[73] She lists a number of policies that relate to the City's failure to adequately train and discipline officers, as well as practices that cover up acts of misconduct.[74]  In return, the City Defendants argue the Velazquez has put forth only conclusory allegations regarding the existence of an official policy or custom.[75]  They also add that Velazquez has alleged the occurrence of only an isolated incident.[76]

The Court has dismissed Velazquez's claims under the Fourth and Fourteenth Amendments for failure to show a constitutional violation.  Without a properly alleged constitutional violation, there can be no municipal liability for the City.  *See Albert*, 819 F. App'x at 203; *Brown*, 742 F. App'x at 884; *Serpas*, 745 F.3d at 774; *see also Hicks-Fields v. Harris Cnty.*, 860 F.3d 803, 808 (5th Cir. 2017) (noting that it is well established that "every *Monell* claim requires an underlying constitutional violation") (internal quotations and citation omitted).  And, even if Velazquez had properly alleged a violation, she has failed to plead anything beyond the most conclusory of allegations regarding City policy.  The relevant section of her Amended Complaint is a laundry list of high-level descriptions of potentially unconstitutional

---

[73] R. Doc. No. 33, at 18 ¶ 66.
[74] *Id.*
[75] R. Doc. No. 35, at 21.
[76] *Id.* at 20.

policies, many of which seem irrelevant to the instant case, and all of which are completely unsupported by any detail.[77]  Both of these problems doom Velazquez's *Monell* claim.

### B.   State Law Malicious Prosecution Claim

Only Velazquez's state law malicious prosecution claim remains.  A district court may decline to exercise supplemental jurisdiction over a state law claim if the court "has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  When all federal claims have been dismissed, a district court has "wide discretion" in deciding whether to exercise jurisdiction over remaining state law claims.  *Guzzino v. Felterman*, 191 F.3d 588, 595 (5th Cir. 1999).  In the Fifth Circuit, "the general rule is to dismiss state law claims when the federal claims to which they are pendent are dismissed."  *Parker & Parsley Petroleum Co. v. Dresser Indus.*, 972 F.2d 580, 585 (5th Cir. 1992).  Courts in the Fifth Circuit also consider judicial economy, convenience, fairness, and comity.  *Mendoza v. Murphy*, 532 F.3d 342, 346 (5th Cir. 2008).  These factors, as well as the statutory factors set out in § 1367(c), weigh in favor of dismissing the Louisiana state law claim, without prejudice, so that Velazquez may assert this claim in a state court.

"[D]eference in this case with respect to the state law issue[s] promotes the important interest of comity to state courts" and "encourages fairness between the parties by 'procuring for them a surer-footed reading of applicable law.'"  *Bitte v. EMC*

---

[77] R. Doc. No. 33, at 17–20 ¶¶ 63–67.  In fact, given the repeated use of "plaintiffs" (as opposed to "plaintiff") in this section of the Amended Complaint, the Court suspects it may have been pulled from a template or an unrelated case.  *See id.*

*Mortg. Corp.*, No. 07-9273, 2009 WL 1950911, at *2 (E.D. La. July 1, 2009) (Africk, J.) (citations omitted) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)).  Furthermore, the litigation in this case is still in its early stages so the parties will not be prejudiced.  *See Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 351 (1988) (noting that when federal claims are eliminated at an "early stage" of the litigation, "the District Court ha[s] a powerful reason to choose not to continue to exercise jurisdiction").

Therefore, the Court declines to exercise supplemental jurisdiction over the remaining state law claim.

## V.

Accepting the facts alleged by Velazquez as true, the Court finds that she has failed to state a claim for relief.  Separately, the Court notes that Velazquez's opposition to the motions to dismiss includes a one-sentence request for leave to amend her complaint.[78]  "Although leave to amend under Rule 15(a) is to be freely given, that generous standard is tempered by the necessary power of a district court to manage a case." *Yumilicious Franchise, L.L.C. v. Barrie*, 819 F.3d 170, 177 (5th Cir. 2016) (quoting *United States ex rel. Willard v. Humana Health Plan of Tex., Inc.*, 336 F.3d 375, 387 (5th Cir. 2003)).  The Fifth Circuit has previously stated that "[a] bare request in an opposition to a motion to dismiss—without any indication of the particular grounds on which the amendment is sought—does not constitute a motion [within] the contemplation of Rule 15(a)." *Id.* (quoting *Confederate Mem'l Ass'n, Inc.*

---

[78] R. Doc. No. 41, at 13; R. Doc. No. 45, at 14.

*v. Hines*, 995 F.2d 295, 299 (D.C. Cir. 1993)).  Moreover, Velazquez has already been afforded such leave once—and warned that the Court was not inclined to give her another opportunity absent a reason to do so.[79]  And Velazquez has identified no such reason.  Accordingly, to the extent Velazquez's opposition briefs might be construed to request leave to amend, such relief is denied.  Therefore,

**IT IS ORDERED** that the motions to dismiss are **GRANTED**; the federal claims against all defendants are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that the state law claim against the above-named defendants is **DISMISSED WITHOUT PREJUDICE** to its being timely asserted in state court.

**IT IS FURTHER ORDERED** that Velazquez's unopposed motion[80] to continue trial and associated deadlines is **DISMISSED AS MOOT**.

New Orleans, Louisiana, March 31, 2021.

**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**

---

[79] *See* R. Doc. No. 28 (noting that, during a status conference, the Court ordered plaintiff to file an Amended Complaint and informed counsel that "there would not be further opportunity to amend"); R. Doc. No. 34 (dismissing the original motions to dismiss without prejudice and warning counsel for Velazquez that "should [her] opposition not substantively address defendants' arguments as to certain claims," that the Court might treat the motions as unopposed for purposes of those claims).
[80] R. Doc. No. 57.